IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOHN DOE,

    Plaintiff,

      v.

THURBERT E. BAKER
Attorney General State of Georgia, et
al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:05-CV-2265-TWT

## ORDER AND OPINION

This is an action challenging the constitutionality of O.C.G.A. § 42-1-13.  It is

before the Court on the Defendants' Motion to Dismiss [Doc. 5].  For the reasons set

forth below, the Defendants' motion is GRANTED.

## I. BACKGROUND

The Plaintiff, John Doe, is a resident of Cobb County, Georgia.  In 2002, he

entered an Alford plea[1] to a charge of child molestation and was sentenced to ten years

on probation.  After entering his plea, he registered with the Georgia Sex Offender

---

[1]An "Alford plea" occurs when a defendant pleads guilty but maintains that he
was innocent.  See, e.g., U.S. v. Brown, 117 F.3d 471, 478 n.5 (11th Cir. 1997).

Registry in accordance with O.C.G.A. § 42-1-12 and notified the authorities as to the location of his residence.  In 2003, the Georgia General Assembly enacted O.C.G.A. § 42-1-13 (the "Residency Act").  The statute states in relevant part:

> No individual required to register under Code Section 42-1-12 shall reside within 1,000 feet of any child care facility, school, or area where minors congregate. Such distance shall be determined by measuring from the outer boundary of the property on which the individual resides to the outer boundary of the property of the child care facility, school, or area where minors congregate at their closest points.

O.C.G.A. § 42-1-13 (b).  In a letter dated March 29, 2005, the Plaintiff was notified that he was in violation of the Residency Act because his home was within 1,000 feet of a private school and a daycare center.  The Plaintiff subsequently purchased a residence where he could live without violating the Residency Act.  His wife, mother-in-law, daughter, and son remain at the family residence in Marietta where the Plaintiff lived for sixteen years.

On August 30, 2005, the Plaintiff filed this lawsuit against the Defendants, Thurbert Baker, Attorney General for the state of Georgia, and Patrick Head, the Cobb County District Attorney.  He challenged the constitutionality of O.C.G.A. § 42-1-13 as violative of the Ex Post Facto Clause, the Eighth Amendment, and Fourteenth Amendment Due Process and Right to Privacy.  He subsequently amended his complaint on January 25, 2006, to include a Fifth Amendment Takings claim.  The Defendants now move to dismiss all claims.

## II. <u>MOTION TO DISMISS STANDARD</u>

A complaint should be dismissed under Rule 12(b)(6) only where it appears beyond doubt that no set of facts could support the plaintiff's claims for relief. Fed. R. Civ. P. 12(b)(6); <u>see</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957); <u>Linder v. Portocarrero</u>, 963 F.2d 332 (11th Cir. 1992). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. <u>See</u> <u>Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.</u>, 711 F.2d 989, 994-95 (11th Cir. 1983). Generally, notice pleading is all that is required for a valid complaint. <u>See</u> <u>Lombard's, Inc. v. Prince Mfg., Inc.</u>, 753 F.2d 974, 975 (11th Cir. 1985), <u>cert. denied</u>, 474 U.S. 1082 (1986). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. <u>Id.</u>[2]

---

[2]Neither side relies upon facts outside the pleadings and there are no factual disputes to be adjudicated at a trial. Therefore, it is appropriate to resolve the legal issues by ruling on the merits of the Defendants' Motion to Dismiss.

III. <u>DISCUSSION</u>

A.    <u>Pullman Abstention</u>

The Defendants first argue that the <u>Pullman</u> abstention doctrine mandates that this Court defer to state court on all of the Plaintiff's claims except the ex post facto challenge since none of the other claims have been previously heard by a Georgia state court.  The doctrine originated in <u>Railroad Commission of Tex. v. Pullman Co.</u>, 312 U.S. 496 (1941).  The Pullman Company and the railroads attacked the Texas Railroad Commission's authority to require a Pullman conductor, rather than just a porter, on every sleeping car operated in the state.  The plaintiffs argued both that this order was not authorized by Texas law and that, since all porters were black while conductors were white, it violated the Equal Protection, Due Process and Commerce Clauses of the United States Constitution.  The Supreme Court held that the "last word" on the Commission's statutory authority necessarily belonged not to a federal court, but to the Supreme Court of Texas.  <u>Id.</u> at 500.  Thus, if the Texas court found that the Commission lacked authority, the litigation would end.  For that reason, the Supreme Court held that the federal courts should abstain from ruling on the constitutionality of the defendant's actions and allow the case to be brought in state court.  <u>Id.</u> at 501-02.

It is now well established that under the <u>Pullman</u> abstention doctrine, a federal court will defer to state court resolution of an underlying claim where two elements are satisfied: "(1) the case must present an unsettled question of state law, and (2) the question of state law must be dispositive of the case or would materially alter the constitutional question presented." <u>Pittman v. Cole</u>, 267 F.3d 1269, 1286 (11th Cir. 2001). The purpose of the <u>Pullman</u> abstention doctrine is to:

> [A]void unnecessary friction in federal-state functions, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication. Because abstention is discretionary, it is only appropriate when the question of state law can be fairly interpreted to avoid adjudication of the constitutional question.

<u>Id.</u> It is well established, however, that abstention is an "extraordinary and narrow exception" to a federal court's obligation to hear constitutional claims. <u>Allegheny County v. Frank Mashuda Co.</u>, 360 U.S. 185, 188 (1959). This exception should be exercised only in "exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." <u>Id.</u>; <u>see also</u> <u>Reetz v. Bozanich</u>, 397 U.S. 82, 86 (1970) (recognizing that "[a]bstention certainly involves duplication of effort and expense and an attendant delay").

In this case, there are no exceptional circumstances that would justify deferring this case for resolution in state court. There are no unsettled questions of state law that could save this statute from the scrutiny of this Court. As applied to this Plaintiff,

the Residence Act is clear and unambiguous.  The Defendants have not shown that the state courts could narrow the scope of the statute to eliminate the constitutional issues. The substance of the Defendants' argument appears to be merely that, because a state court has not addressed these issues, the federal court is precluded from taking first crack at them.  (Defs.' Mot. to Dismiss, at 6.)  This is a much broader interpretation of the <u>Pullman</u> abstention doctrine than has been applied by the Supreme Court and is thus one that this Court declines to adopt.  The Court concludes that the <u>Pullman</u> abstention doctrine does not apply.  The Court, therefore, will address each of the constitutional claims on the merits.

      B.     <u>Constitutional Challenges</u>

            1.     <u>Ex Post Facto Clause</u>

The Plaintiff alleges that the Residence Act violates the Ex Post Facto Clause by subjecting him to additional punishment following his conviction for child molestation.  The framework for determining whether a statute imposes retroactive punishment in violation of the Ex Post Facto Clause was clearly established by the Supreme Court in <u>Smith v. Doe</u>, 538 U.S. 84 (2003).  The Court held:

> If the intention of the legislature was to impose punishment, that ends the inquiry.  If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil.

Id. at 92 (citations and punctuation omitted).  The Court established, moreover, that "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty."  Id.

As an initial matter, this Court finds, and the Plaintiff does not dispute, that the General Assembly's intent in enacting O.C.G.A. § 41-1-13 was to create a civil regulatory scheme.  The Georgia Supreme Court explained that the statute's intent was as follows:

> The Statute is designed to safeguard against encounters between minors and a convicted sex offender by requiring at least a 1,000 foot distance between places where the former congregate and the latter resides. While not every convicted sex offender will be a recidivist, the statute aims to lessen the potential for those offenders inclined toward recidivism to have contact with, and possibly victimize, the youngest members of society.

Mann v. State, 278 Ga. 442, 443-44 (2004).  The Court concurs with this assessment, finding nothing on the statute's face that suggests that it is anything other than a civil scheme designed to protect the public from harm.  Smith, 538 U.S. at 93.

The Court next analyzes the effect of this regulatory scheme and applies the five factors adopted by Smith in determining whether the Residency Act's punitive effects outweigh the state's regulatory intent.  These factors are "neither exhaustive nor dispositive" but are "useful guideposts."  Id. at 97.  They include the following: (1) whether the law was regarded in history and tradition as punishment; (2) whether it

promotes the traditional aims of punishment; (3) whether it imposes an affirmative disability or restraint; (4) whether it has a rational connection to a non-punitive purpose; and (5) whether it is excessive with respect to that purpose. Smith, 538 U.S. at 97; Doe v. Miller, 405 F.3d 700, 719 (8th Cir. 2005).[3]

The first factor for consideration is the statute's history and tradition of punishment. The Plaintiff asserts that the Residence Act effectively banishes him. He cites to Justice Brewer's dissenting opinion in United States v. Ju Toy, 198 U.S. 253 (1905), which defined banishment as "a punishment inflicted upon criminals by compelling them to quit a city, place, or country for a specified period of time, or for life." Id. at 269-70. The Plaintiff argues that he meets this definition because he has been forced to vacate a particular place, his long-standing family home. However, the Supreme Court has made clear that, historically, banished offenders were expelled from their original community and prevented from returning. Smith, 538 U.S. at 98. That analogy fails here because this law does not prevent the Plaintiff from accessing these restricted areas at any time of the day for any purpose other than establishing

---

[3]The Eighth Circuit upheld a virtually identical Iowa statute prohibiting a sex offender from residing within 2,000 feet of a school or other place where children congregate. Miller, 405 F.3d at 705. The main distinction between that law and this one is that Iowa's included a grandfather clause, excluding from its purview both those persons who had established a residence prior to the effective date of the law and those schools or child care facilities that were newly located after the effective date.

residence.  See Miller, 405 F.3d at 719.  Furthermore, the fairly recent origin of these types of sex offender statutes suggests that they do not involve a traditional means of punishment.  Smith, 538 U.S. at 97.

The Court takes judicial notice that Cobb County is primarily a suburban county where it would be relatively easy to find an affordable residence that is more than 1,000 feet from a school or daycare center.  It is undisputed that the Plaintiff has found a residence in the county where he can live without violating the Residence Act.  Therefore, he has no standing to claim that the effect of the act is to banish him from residence in the community.  A more restrictive act that would in effect make it impossible for a registered sex offender to live in the community would in all likelihood constitute banishment which would result in an ex post facto problem if applied retroactively to those convicted prior to its passage.

The Court next looks at whether the Residence Act promotes the traditional aims of punishment.  The two main elements considered under this category are deterrence and retribution.  Id. at 102.  The Supreme Court has emphasized that the potential value of a law as a deterrent to future crimes should not be overemphasized as a means to render the statute criminal.  Id.  Making such an inferential leap would "severely undermine the Government's ability to engage in effective regulation." Id. The retributive effects of this statute are similarly difficult to evaluate.  Miller, 405

F.3d at 720.  In <u>Smith</u>, the Supreme Court held that because the broad categories of sex offender classification and the corresponding reporting requirements were reasonably related to the danger of recidivism, the statute was "consistent with the regulatory objective."  <u>Smith</u>, 538 U.S. at 102.  The Eighth Circuit similarly found that, while any restraint or requirement had at least a potentially retributive effect, a law placing restrictions on the residency of sex offenders was consistent with the regulatory objective.  <u>Miller</u>, 405 F.3d at 700.  This Court concurs with the Eighth Circuit's conclusion that, regardless of whatever potential this residency restriction might have as a deterrent or as retribution, it is still consistent with a regulatory purpose.

The Court next considers whether the law works an affirmative disability or restraint on the Plaintiff.  The paradigmatic example of an affirmative disability or restraint is imprisonment.  <u>Smith</u>, 538 U.S. at 100 (citing <u>Hudson v. United States</u>, 522 U.S. 93, 104 (1997)).  The Plaintiff argues that this law imposes a significant disability because it forces him to move from his long-standing residence.  He claims that, had he known about this statute at the time of his prosecution, he might have chosen to go to trial rather than accepting a plea.  (Pl.'s Resp. to Def.'s Mot. to Dismiss, at 12.)  However, the Supreme Court has granted the states considerable leeway in adopting regulations that impose substantial disabilities.  The Court

recently held that even the involuntary commitment of a mentally ill sex offender was non-punitive.  See Kansas v. Hendricks, 521 U.S. 346, 363 (1997).  Even though the Plaintiff is being forced to move from his home, this disability is nowhere near as significant as the involuntary commitment approved in Hendricks.  Moreover, like the Eighth Circuit, this Court finds that consideration of this factor "ultimately points us to the importance of the next inquiry: whether the law is rationally connected to a nonpunitive purpose, and whether it is excessive in relation to that purpose."  Miller, 405 F.3d at 721.  It is only by considering the disability within the context of the statute's purpose that this Court can determine whether an ex post facto violation has occurred.

Thus, the final issue is whether the Residence Act has a rational connection to a non-punitive purpose which is not excessive.  According to the Supreme Court, this rational connection is the most significant factor in determining whether the statute's effect was punitive.  Smith, 538 U.S. at 102.  The Residence Act's legitimate non-punitive purpose is protecting the public by preventing sex offenders from establishing a residence within 1,000 feet of certain locations identified as places where children congregate.  The General Assembly could rationally conclude that such a restriction upon residence would reduce the likelihood and opportunities for recidivism.  The Plaintiff contends, however, that the Defendants' concession that the

law allows him to "visit, own, lease or do business on the subject property," demonstrates that it does not have a rational connection to that purpose. The Court finds the Plaintiff's contention unpersuasive for several reasons. First, the rational basis standard is highly deferential, and a court will find a legislative act unconstitutional under this standard in only the most exceptional circumstances. Doe v. Moore, 410 F.3d 1337, 1345 (11th Cir. 2005). Furthermore, the Court's task is not to examine whether the legislature has made the best possible choice and should not deem a law to be punitive "simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." Smith, 538 U.S. at 103, 105. Finally, the legislature is entitled to deal with problems in incremental fashion, "addressing itself to the phase of the problem which seems most acute to the legislative mind." Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 489 (1955). Prohibiting a sex offender from living near a school or daycare center is certainly an appropriate step in achieving the ultimate goal of protecting children. Thus, this Court finds that this law has a rational connection to a legitimate government purpose.

This Court must also assess whether this statute is excessive in relation to its purpose. This examination, however, "is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light

of the nonpunitive objective." Smith, 538 U.S. at 105. The Plaintiff argues that because he has been forced to move from his home of sixteen years, the statute is excessive for its purpose.[4] The Court finds, however, that the statute is reasonable in relation to its objective. The statute's purpose is to minimize the potential for interaction between sex offenders and minors by forcing offenders to establish a residence at least 1,000 feet from "any child care facility, school, or area where minors congregate." O.C.G.A. § 42-1-13(b). It stands to reason that in order to achieve that objective, some sex offenders will be forced to move from their current homes. It is antithetical to that purpose, moreover, to allow these individuals to continue to reside inside that restricted area simply because they were fortunate enough to have established their residence prior to the statute's effective date.

After considering all of these factors, this Court finds that the punitive effects alleged by the Plaintiff do not constitute a violation of the Ex Post Facto Clause. The law was enacted with a clear regulatory intent, and the fact that the Plaintiff has been

---

[4]The Plaintiff also challenges the statute on the grounds that, if a new school is built within 1,000 feet of his current residence, it will further punish him by forcing him to move again. (Pl.'s Resp. to Def.'s Mot. to Dismiss, at 15.) However, because the Plaintiff has not suffered any actual injury, he has no standing to make such a challenge. See Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) (stating that a plaintiff's alleged injury must be "concrete and actual or imminent, not conjectural or hypothetical"); see also Coston v. Petro, 398 F. Supp. 2d 878, 887 (S.D. Ohio 2005) (denying a similar challenge because of lack of standing). The Court thus declines to address this claim.

forced to move does not overcome the important state interests that inspired this legislation.

        2.    <u>Eighth Amendment</u>

The Plaintiff alleges that this law violates the Eighth Amendment prohibition against cruel and unusual punishment. However, because this Court has determined that the law is non-punitive, there can be no Eighth Amendment violation. <u>See</u> <u>Miller</u>, 405 F.3d at 723 n.6. The Court grants the motion for dismissal as to this claim.

        3.    <u>Procedural Due Process</u>

The Defendants move to dismiss the Plaintiff's claim that the law violates due process because it imposes punishment without an individualized showing of dangerousness. The Plaintiff has failed to respond, indicating that he does not oppose the motion. <u>See</u> L.R. 7.1(B), N.D. Ga. The Court deems this failure to be an abandonment of the claim. <u>See</u> <u>City of Lawrenceville v. Ricoh Electronics, Inc.</u>, 370 F. Supp. 2d 1328, 1333 (N.D. Ga. 2005). The Court thus dismisses this claim.

        4.    <u>Substantive Due Process</u>

The Plaintiff next alleges that this statute violates his substantive due process rights under the Fourteenth Amendment. "This substantive component protects fundamental rights that are so 'implicit in the concept of ordered liberty' that 'neither liberty nor justice would exist if they were sacrificed.'" <u>Moore</u>, 410 F.3d at 1342-43

(quoting Palko v. Connecticut, 302 U.S. 319, 325 (1937)). The Supreme Court has expressed extreme reluctance to expand this concept, however, stating that it would do so only with the utmost care. Washington v. Glucksberg, 521 U.S. 702, 720 (1997). Thus, a substantive due process claim, to be successful, must be "deeply rooted in this Nation's history and tradition" and the asserted liberty carefully described. Id. at 720-21. Because of this exacting standard, the Supreme Court has, in its entire history, recognized only a very limited number of substantive due process rights:

> [I]n addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights to marry, Loving v. Virginia, 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967); to have children, Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942); to direct the education and upbringing of one's children, Meyer v. Nebraska, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923); Pierce v. Society of Sisters, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); to marital privacy, Griswold v. Connecticut, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965); to use contraception, ibid.; Eisenstadt v. Baird, 405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972); to bodily integrity, Rochin v. California, 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952), and to abortion, [Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992)].

Id. at 720. When a statute infringes on a right that is deemed to be fundamental, "courts will review the law under a strict scrutiny test and uphold it only when it is 'narrowly tailored to serve a compelling state interest.'" Moore, 410 F.3d at 1343 (quoting Reno v. Flores, 507 U.S. 292, 302 (1993)). A law that does not implicate

fundamental rights need only be "rationally related to legitimate government interests." Id. at 1345 (quoting Glucksberg, 521 U.S. at 728).

Here, the Plaintiff alleges that the Residence Act infringes on his right to privacy and the right of his extended family to live together. He claims that because the law requires him to move, it implicitly affects the relations within his family, as all members are forced to choose between either joining him in a residence outside the restricted area or suffering from his absence at the previously established family home. (Pl.'s Resp. to Defs.' Mot. to Dismiss, at 22.) In support of this alleged liberty interest, the Plaintiff relies upon a quote from Miller granting a "right to be free from intrusive regulation of family living arrangements." Miller, 405 F.3d at 710. He claims that this right arises out of two Supreme Court decisions, Griswold v. Connecticut, 381 U.S. 479, 482 (1965) and Moore v. City of East Cleveland, 431 U.S. 494, 498 (1977). The Court is not persuaded. The Eighth Circuit aptly explained why Griswold and City of East Cleveland could not assist a plaintiff in challenging a residency restriction:

> Unlike the precedents cited by the Does, the Iowa statute does not operate directly on the family relationship. Although the law restricts where a residence may be located, nothing in the statute limits who may live with the Does in their residences. The plurality in Moore emphasized this distinction, observing that the impact on family was "no mere incidental result of the ordinance," because "[o]n its face [the ordinance] selects certain categories of relatives who may live together and declares that others may not." 431 U.S. at 498-99, 97 S. Ct. 1932

(plurality opinion).  Thus, the reasoning of the <u>Moore</u> plurality does not require strict scrutiny of a regulation that has an incidental or unintended effect on the family. . . .   Similarly, the Court in <u>Griswold</u> disclaimed authority to determine "the wisdom, need, and propriety" of all laws that touch social conditions, but held unconstitutional a state statute that "operate[d] directly on an intimate relation of husband and wife."

<u>Miller</u>, 405 F.3d at 710-11.  Like the Iowa law, the Georgia Residence Act, on its face, has no effect on the family since sex offenders are permitted to live with whomever they choose.  Thus, given this lack of precedential support and the Supreme Court's stated reluctance to expand constitutional rights, this Court declines the Plaintiff's invitation to recognize the violation of a liberty interest here.   Furthermore, as discussed above, this law is rationally related to the legitimate government interest of protecting children.  Dismissal of this claim is thus warranted.

5.   <u>Fifth Amendment Taking</u>

In his amended complaint, the Plaintiff further alleges that the Residence Act violates the Fifth Amendment, which provides in pertinent part: "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V. A regulation that denies all economically beneficial or productive use of land is a taking that requires compensation. <u>Lucas v. South Carolina Coastal Council</u>, 505 U.S. 1003, 1015 (1992).  To determine whether this statute has caused a taking of the Plaintiff's property, the Court must examine: (1) the statute's economic impact on the Plaintiff; (2) the extent to which the statute interferes with the Plaintiff's reasonable

investment-backed expectations; and (3) the character of the government action, i.e., the interests promoted by the statute.  <u>Palazzolo v. Rhode Island</u>, 533 U.S. 606, 617 (2001); <u>Penn Cent. Transp. Co. v. City of New York</u>, 438 U.S. 104, 124 (1978).

Here, none of the factors support the Plaintiff's takings claim.  First, the economic impact of the regulation is fairly minimal.  The Plaintiff is not forced to sell his home, nor has he claimed a loss in its value.  The fact that he is prohibited from living there does not alone demonstrate a significant economic impact.  Similarly, the Plaintiff has not shown that this regulation interfered with any reasonable investment-backed expectations.  This factor is generally implicated where a government regulation affects a company or individual's economic expectations in a way that could not have been anticipated.  <u>Vesta Fire Ins. Corp. v. State of Fla.</u>, 141 F.3d 1427, 1432 (11th Cir. 1998) (<u>citing</u> <u>Connolly v. Pension Ben. Guar. Corp.</u>, 475 U.S. 211, 226-228 (1986)).  A statute might constitute a taking, for example, if it required a landowner, against his will, "to rent his property or to refrain in perpetuity from terminating a tenancy."  <u>Yee v. City of Escondido, Cal.</u>, 503 U.S. 519, 528 (1992).  The Residence Act is much less burdensome on the property.  Whereas, the above cited examples force a landowner to surrender use of the property against his consent, this regulation requires only that the Plaintiff not use it as a residence for a period of time.  Any other reasonable use of the property remains within his bundle of rights.

See Dolan v. City of Tigard, 512 U.S. 374, 401 (1994) ("where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety").

Finally, and most importantly, these relatively minimal considerations are contrasted with a strong governmental interest in enforcing this regulation. A "taking" is unlikely to be found where the state is merely adjusting the benefits and burdens to promote the common good. See Penn Cent. Transp. Co., 438 U.S. at 124. Here, the purpose of this residency restriction is to protect the public, and specifically minors, from sex offenders who have a higher rate of recidivism than any other type of offender. See Smith, 538 U.S. at 103. The statute does so by preventing this type of offender from residing within 1,000 feet of any place where children congregate. The statute aims "to lessen the potential for those offenders inclined toward recidivism to have contact with, and possibly victimize, the youngest members of society." Mann, 278 Ga. at 444. Although not every sex offender will repeat his offense, this statute's aim is to minimize this potential danger by decreasing the likelihood that these individuals will come into regular contact with children. Id.

Weighing these factors together, this Court concludes that the enforcement of this statute does not constitute a taking of the Plaintiff's property. The economic impact on his property and his investment-backed expectations are minimal,

particularly in comparison to the significant government interests at stake in this regulation. Moreover, the Supreme Court has emphasized that the Takings Clause's ultimate design is "to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Palazzolo, 533 U.S. at 618. The Court does not find that the state of Georgia, by forcing sex offenders to live at least a quarter of a mile away from areas where children congregate, is forcing them to bear a burden that rightfully belongs to the public as a whole. It was the Plaintiff's own actions that created his current problem, and it should not be the public's responsibility to compensate him for any monetary hardship he suffers in order to comply with this legitimate government regulation. The burden has been placed on the appropriate shoulders. Therefore, the Court finds that the Defendants' motion to dismiss this claim should be granted.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' Motion to Dismiss [Doc. 5] is GRANTED.

SO ORDERED, this 5 day of April, 2006.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge